IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Diane Richardson, | ) | |
| | ) | Civil Action No. 4:09-104-TLW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Triad Hospitals, Inc. Group Long Term | ) | |
| Disability Plan, Triad Hospitals, Inc., and | ) | |
| Unum Life Insurance Company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

This action was originally filed in the Court of Common Pleas in Florence, South Carolina

as an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended,

29 U.S.C. §§ 1001, et seq.  Plaintiff has asserted a claim for denial of long term disability (LTD)

benefits.  This case was removed to the United States District Court, Florence Division, on January

16, 2009. (Doc. #1).  Presently before the Court is the Defendant's motion for judgment, filed

October 27, 2009.  (Doc. # 27).  Plaintiff filed a response in opposition to Defendant's motion on

November 16, 2009.  (Doc. # 31).  Defendant filed a Reply on November 19, 2009.  A hearing was

held on December 15, 2009.  The matter is now ripe for disposition.

## FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff Diane Richardson brings this action to recover long term disability benefits pursuant

to the Employee Retirement Income Security Act of 1974, ERISA 29 U.S.C. § 1132 (a) (1) (B).

---

[1]The factual and procedural history is taken in large part from Defendant's memorandum
in support of judgment, and appears to be uncontested.

Plaintiff, a medical nurse, indicates that she was involved in a motor vehicle accident on August 23, 2004, injuring her neck and lower back. In 2005, Richardson was employed by Triad Hospitals, Inc. as a registered nurse. (Exhibit 1, UACL00028-32). Triad Hospital established and/or maintained long term disability with Unum Life Insurance Company of America ("Unum") as part of Triad's ERISA governed employee welfare benefits plan. (Exhibit 1). Richardson was a participant in this plan. On February 14, 2005, Richardson, by telephone, made a claim for long term disability benefits with Unum. (Exhibit 1, UACL00028-32). On February 16, 2005, Plaintiff informed Unum in follow-up telephone conversation that Plaintiff suffered bulging cervical and lumbar discs due to a traffic accident where she was rear ended. (Exhibit 1, UACL00045-46). Plaintiff further indicated that she worked for Triad as a labor and delivery nurse, and that due to her condition, she could not stand for prolonged periods. (Exhibit 1, UACL00046). On March 3, 2005, Richardson submitted an attending physician statement filled out by Dr. Jose Santiago, her treating neurosurgeon. (Exhibit 1, UACL00121). Dr. Santiago diagnosed Plaintiff with "739.4 – SI Joint Dysfunction, 725.0 C.I. Stenosis, 732.1 - Neck Pain, 724.5 -Back Pain." He further found that Plaintiff could not work at her occupation or any other occupation at that time.

On March 8, 2005, Unum wrote Richardson that it was approving her claim for benefits under the "regular occupation" definition of disability under the plan, and that benefits were being paid retroactively from February 2, 2005. (Exhibit 1, UACL00135- 138).

On January 3, 2007, Unum wrote Plaintiff that it had approved her claim for continuing benefits. (Exhibit 1, UACL00583-585). On February 27, 2007, Unum informed Plaintiff by telephone that due to a miscalculation, Plaintiff had been overpaid $5,237,64 in benefits. (Exhibit 1, UACL00631).

On March 16, 2007, Unum wrote Richardson that because her employer misstated Plaintiff's earnings when the claim was submitted, Unum would agree to waive the overpayment. However, moving forward, Unum would pay the corrected benefit amount. (Exhibit 1, UACL00647). On March 16, 2007, Unum wrote Dr. Kammer, Plaintiff's new treating neurosurgeon, to have Dr, Kammer update Plaintiff's restrictions and limitations and to fill out an estimated Functional Abilities Form. (Exhibit 1, UACL00676-678). Dr. Kammer's office faxed back the forms with the handwritten statement, that Dr. Kammer "does not do estimated functional capacity eval." (Exhibit 1, UACL00678).

On April 23, 2007, Plaintiff's attorney wrote Unum to inform it that Plaintiff's claim for Social Security disability benefits had been denied and that Plaintiff's claim against the third-party who injured her in the automobile accident had not been settled. (Exhibit 1, UACL00715-731).

On June 29, 2007, Unum had a medical review performed on Plaintiff's claim by Steven Leverett, DO, DABFM, DABMA. (Exhibit 1, UACL00774-780). Dr. Leverett reviewed Plaintiff's medical records and attempted to call Dr. Kammer in order to get a thorough understanding of Plaintiff's condition. Dr. Kammer's office again informed Dr. Leverett that Dr. Kammer was unable to comment on Plaintiff's work capacity. Dr. Leverett found that because the impact of Plaintiff's residual symptoms and complaints on Plaintiff's function was not clear, a functional capacity evaluation ("FCE") was appropriate.

On July 2, 2007, Unum wrote Plaintiff that it wanted to set up an FCE. (Exhibit 1, UACL00786-787). Also on July 2, 2007, Unum wrote Dr. Kammer to get a prescription for a FCE. (Exhibit 1, UACL00795-796). However, on July 20, 2007, Dr. Kammer's office faxed back that "Dr. Kammer will not send a Rx for functional capacity eval." (Exhibit 1, UACL00795). On August 7,

2007, Plaintiff's attorney wrote Dr. Kammer that Richardson would be happy to undergo an FCE if Dr. Kammer deemed it appropriate. (Exhibit 1, UACL00807). On August 13, 2007, Unum wrote Plaintiff that it had scheduled an FCE for August 29, 2007. (Exhibit 1, UACL00843). However, on August 16, 2007, Plaintiff's attorney wrote Unum indicating that Dr. Kammer advised Plaintiff that she should not undergo an FCE at that time. (Exhibit 1, UACL00870). The FCE was subsequently cancelled.

On October 22, 2007, Unum wrote Richardson that Unum learned that Plaintiff had received a third-party settlement from Liberty Mutual due to her automobile accident, and that a portion of that settlement was a setoff under the terms of the long term disability plan. (Exhibit 1, UACL00911-920). Unum further informed Plaintiff that as a result of this setoff, Unum had overpaid Plaintiff $8,071.28. On October 29, 2007, Unum wrote Plaintiff explaining that if Plaintiff disagreed with Unum's finding that an overpayment had occurred, she could appeal the decision. (Exhibit 1, UACL00928-930).

On October 31, 2007, Unum again wrote Dr. Kammer to get copies of his updated medical records. (Exhibit 1, UACL00945-946). Dr. Kammer sent these records to Unum. (Exhibit 1, UACL00947-950). Dr. Kammer's office note of September 5, 2007 indicated that while Plaintiff had muscle spasms in her neck, she had good arthrodesis at C5-6 and that from his standpoint, she had reached maximum medical improvement. (Exhibit 1, UACL00947).

On November 2, 2007, Unum had another medical review performed on Plaintiff's claim by Dr. Leverett. (Exhibit 1, UACL00953). Dr. Leverett found:

> I reviewed the new medical acquired by DBS [disability benefit specialist] D Webb which includes OVNs [office visit notes]from Dr. Kammer, the surgeon, 8-6-07, 8-22-07 and 9-5-

07. As of 9-5-07, the Insured was deemed at MMI by AP who referenced CT scan (not in file) from 8-07 that showed solid arthrodesis at the C5-6 and C6-7 levels without evidence of pseudoarthrosis. AP noted the Insured "is very happy and appreciative of her surgery". Cervical muscle spasms still present, and recommendation for follow up with Dr. Docherty (rheumatology) was made. The Insured previously reported home schooling her child, an activity that would likely be consistent with at least sedentary level exertion. The surgery completed was successful, albeit with some residual spasm. There are no APs [attending physicians] opining Rs and Ls [restrictions and limitations].The FCE and IME previously recommended in June, 2007 are no longer necessary. It is medically reasonable for the Insured to have the physical functional capacity that would allow for full time engagement in activities and work consistent with sedentary level exertion. I have reviewed the new information provided to me by Company personnel bearing on the conditions for which I am by training and experience capable to assess. This information supplements that information which was reviewed previously and certified by me.

(Exhibit 1, UACL00953).

On November 6, 2007, Unum called Dr. Kammer's office concerning Richardson's restrictions and limitations. Dr. Kammer's office again refused to fill out the claim forms. (Exhibit 1, UACL00965).

On November 26, 2007, Unum wrote Plaintiff that because she had not repaid the $8,071.28 overpayment that Unum would begin applying the full monthly benefit to the overpayment until it was recovered in full. (Exhibit 1, UACL00987).

On November 27, 2007, Plaintiff's attorney wrote Unum that Plaintiff was denied reconsideration on her Social Security disability and that he had filed a request for a hearing. (Exhibit 1, UACL00993-1018).

On December 11, 2007, Unum performed a preliminary vocational review on Plaintiff's claim. (Exhibit 1, UACL01027-1028). This vocational review determined that based on Plaintiff's gainful wage threshold, transferable work skills and computer skills, that a variety of other comparable occupations likely existed in Plaintiff's labor market.

On January 24, 2008, Dr. Leverett wrote Dr. Kammer's office to confirm that Dr. Kammer will not due an FCE. (Exhibit 1, UACL01041). Also on January 24, 2008, Unum wrote Dr. Doherty, Plaintiff's treating Rheumatologist, to confirm a conversation Dr. Doherty had with Dr. Leverett during which the following was discussed: "Ms. Richardson was last seen in October, 2007. You stated that Ms. Richardson had problems with her neck, and she had Fibromyalgia type symptoms, no Lupus or RA [rheumatoid arthritis]. You acknowledged that she possibly had full time sedentary level work capacity, and that may be worth a trial, but that you recommend an FCE to best determine her current work capacity." (Exhibit 1, UACL01051-1052).

On February 1, 2008, Plaintiff's attorney wrote Unum that she was appealing the calculation of the $8,071.28 overpayment. (Exhibit 1, UACL01073-1075). On February 11, 2008, Unum wrote Plaintiff's attorney that Unum's decision to request the repayment of the overpayment was correct. (Exhibit 1, UACL01254-1256). Unum pointed out that it was not making a claim for subrogation as Plaintiff argued, but was reducing the benefit level by the express offset terms in the policy. However, Unum indicated that based on the reported attorney's fees and costs, presented by Plaintiff for the first time in the materials submitted on appeal, Unum recalculated the overpayment from $8,071.28 to $2,273.20.

On January 25, 2008, Dr. Doherty wrote a prescription for Richardson to undergo an FCE. (Exhibit 1, UACL01290). On February 21, 2008, Unum wrote Plaintiff that it was trying to schedule an FCE. (Exhibit 1, UACL01274-1276). Unum subsequently scheduled an FCE. On March 27-30, 2008, Unum had surveillance performed on Plaintiff. (Exhibit 1, UACL01356-1367). On March 31, 2008, Plaintiff called Unum to cancel the FCE due to emergency dental work. (Exhibit 1,

UACL01352). On April 16, 2008, Unum rescheduled an FCE for April 29, 2008. (Exhibit 1, UACL01393).

On April 29, 2008, Plaintiff finally underwent an independent functional capacity evaluation, performed by Mary Heniford, PT. (Exhibit 1, UACL01424-1432). This FCE found that Plaintiff had part time light work capacity (exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently). The evaluator also noted that "patient would possible benefit from part time status increasing hours as tolerated to full time in that she has been out of work for several years." (Exhibit 1, UACL01430).

On May 16, 2008, Mary Heniford, P.T. added an addendum to her FCE report addressing specific questions as to Plaintiff's ability to perform full time sedentary work. (Exhibit 1, UACL01457). The addendum stated:

1)   Within the context of a Sedentary level exertion demand occupation, does
     the Insured currently have full-time capacity for such a job?

     No

2)   If no, can you recommend a return to work regime/schedule (work, hardening) that
     would be prudent (including recommendations for at home exercises) to initiate to
     get the Insured back to full-time Sedentary work?

     The patient would benefit from a work-conditioning program progressing
     slowly in that this person is deconditioned with poor endurance.

     A strict Home Exercise program which included range of motion, strengthening of
     core and upper and lower extremities would be beneficial. If she has access to a pool
     this would certainly assist her with water aerobics (low impact), swimming, walking,
     etc.

     Conditioning program starting daily for 1 hour per day increasing time as tolerated
     up to 3 to 4 hours per day.

3)   Similarly, if full-time light work was desired and available, what would be the best return to work regime (including recommendations for at home exercise) that you would recommend for the insured?

Deskwork such as scheduling starting as part-time status increasing hours as tolerated to full-time status in that she has been out of work for several years.

Patient would benefit from a strengthening and range of motion program emphasizing core strength and upper and lower extremities. Patient is deconditioned with poor endurance and moves very slowly. Home exercises such as water aerobics, recumbent bike, upper extremity bike and Theraband would help with endurance and range of motion. A work conditioning program starting slowly and gradually working into strengthening exercises for core and upper and lower extremities would be beneficial.

(Exhibit 1, UACL01457).

On June 5, 2008, Dr. Leverett performed another medical review of Plaintiff's claim. (Exhibit 1, UACL01464). Dr. Leverett found:

I previously reviewed the FCE completed 4-29-08 giving the Insured part time light capacity. This FCE is deemed valid. The responses provided by the PT 5-16-08 to follow up questions posed were ambiguous (and not necessarily consistent with the prior assessment of physical functional capacity) regarding a requested work hardening regime. The "strengthening and range of motion program" recommended was appropriate, but lacked specifics re: a time frame for a RTW regimen.

Within a reasonable degree of medical certainty, within a whole person assessment, and within the context of my prior WR and the findings of the FCE, the Insured would be able to return to work in a sedentary level for 4 hours per day for 2 weeks; then 6 hours per day for 2 weeks; then 8 hours per day from then on. If the Insured is motivated, it is possible for the Insured to progress in a similar fashion within a light level of exertional demand. The Insured would benefit from ongoing exercise as recommended by the FCE operator. In addition, the Insured should be configured with an ergonomic workstation, and allowed appropriate breaks and change of position as needed.

(Exhibit 1, UACL01464).

On June 13, 2008, Unum had a vocational review of Plaintiff's claim performed by Robin Giese, CRC, CDMS, CDMS, a Vocational Rehabilitation Consultant. (Exhibit 1, UACL01468-1472). This report found that taking into account Plaintiff's restrictions and limitations, based on

Plaintiff's education, training and experience, she could perform multiple sedentary occupations, including, receptionist (outpatient), hospital admitting clerk, and utilization review coordinator.

On June 23, 2008, Unum wrote Plaintiff's attorney informing her that Plaintiff's claim for continuing disability benefits was being denied in that based on Plaintiff's restrictions and limitation, Plaintiff could perform part time and full time sedentary occupations for which she was reasonably fitted by her education, training and experience. (Exhibit 1, UACL01483-1487). This denial letter stated in relevant part:

> We have based our decision on medical and vocational information obtained, and on the policy provisions. Based on your functional capacity and employment history, we have determined that you are not eligible for benefits as defined above. Our rationale is detailed below.
>
> As you know you stopped working as a Nurse due an injury to your cervical spine from a motor vehicle accident on August 23, 2004 which required surgery. We approved and continued to pay your long term disability claim as we agreed that you were unable to do the material and substantial duties of your occupation of Nurse due to the lifting requirement of that occupation.
>
> As of February 1, 2007 we began reviewing your claim to determine if you would continue to meet the policy's definition of disability beyond 24 months as outlined above.
>
> Since neither Dr. Docherty or Dr. Kammer would provide us with any Restrictions or Limitations regarding your current functional capacity, we decided that an independent evaluation was needed.
>
> To help us in determining your current functional capacity, we referred you for an independent Functional Capacity Evaluation (FCE) that was completed on April 29, 2008. A copy of this FCE was forwarded to Dr. Docherty on June 20, 2008.
>
> We have reviewed the results of the Functional Capacity Evaluation conducted by Ms. Heniford on April 29, 2008. Based on her evaluation of you during the FCE, her findings were that you were deconditioned but would have the functional capacity to work part time in a sedentary occupation leading up to full time within 4 weeks.
>
> A sedentary occupation is performed mostly seated (with the ability to sit and stand as needed), with occasional periods of lifting up to 10 pounds and walking for brief periods of time.

We also had your file reviewed by our Vocational Rehab Consultant who opines that you have the necessary skills for sedentary occupations and that they would readily be available in your area and would be considered gainful.

Your policy states:

"Gainful Occupation means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work."

A gainful occupation for your would be an occupation that would pay you $9.60/hour.

The consultant reviewed your restrictions and limitations, as well as your employment and educational history, and concluded that you would be able to work in the following occupations:

1.    Hospital Admitting Clerk Sedentary $10.09/hour
2.    Utilization Review Coordinator Sedentary $20.06/hour

It was also determined that the occupation of Hospital Admitting Clerk would be available on a part time and full time basis that would typically allow you to ramp up from part time to full time. The occupation of Utilization Review Coordinator is most typically available on a full time basis only.

Because you no longer meet the contractual definition of disability, we regret that we cannot continue paying benefits. A check in the amount of $2,445.40 was sent under separate cover. This amount covers the 4 week period of time that we have opined that it would take you to ramp up to full time work capacity. This check is for the period of June 2nd to July 20 and includes your basic benefit that we owed you, plus the additional 4 weeks.

(Exhibit 1, UACL01484-1485).

Plaintiff appealed this denial on July 17, 2008 and submitted materials for Unum to consider.

(Exhibit 1, UACL01510).

On September 15, 2008, Unum had a medical review performed on Plaintiff's claim by Jacob Martin, M.D., a board certified occupational medicine and forensic specialist. (Exhibit 1, UACL01712-1722). Dr. Martin found that there was no medical evidence that precluded Plaintiff from having full time sedentary work capacity from July 20, 2008 forward.

On October 15, 2008, another vocational review was performed on Plaintiff's claim. (Exhibit 1, UACL01723-1725). This vocational review was performed by Richard Byard, JD, MS, CRC, a Senior Vocational Rehabilitation Consultant. Mr. Byard agreed with the previous vocational review, and additionally indicated that Plaintiff could perform additional occupations not listed in the previous reports such as telephone nurse case manager, and telephonic triage nurse.

On October 13, 2008, Unum wrote Plaintiff's attorney that it was upholding the denial of Plaintiff's claim. (Exhibit 1, UACL01731-1738). The denial letter stated in relevant part:

> We are writing to let you know that Unum Life Insurance Company of America has completed the appellate review for the denial of benefits on your clients Long Term Disability claim. On appeal we have determined that the original decision to deny your client's claim was appropriate.
>
> You may be aware that under your client's policy, the definition of disability changes after we have paid benefits for 24 months. At that time, the claimant must be unable to perform each of the material duties of any gainful occupation for which she is reasonably fitted, based on training, education and experience.
>
> The policy states...
>
> **"HOW DOES UNUM DEFINE DISABILITY?**
>
> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.
>
> The loss of a professional or occupational license or certification does not, in itself, constitute disability.
>
> We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an

examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative."

"Material and substantial duties means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified."

"Regular occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work.

And...

### WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following:
- during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability,
- the date your disability earnings exceed the amount allowable under the plan; or
- the date you die."

As you know, Ms. Richardson's Long Term Disability claim was denied on June 23, 2008 as it was determined that she had the capacity to perform part time sedentary work leading up to full- time within 4 weeks. Her file was reviewed by a Unum vocational consultant who identified other occupations that she could perform within the noted restrictions and limitations identified in the FCE of April 29, 2008. It was further determined that an additional month of benefits would be provided to allow for conditioning as it was noted within the FCE that Ms. Richardson was deconditioned and would benefit from a work hardening program. Long Term Disability benefits were paid through July 20, 2008.

In your letter of appeal dated July 21, 2008 you asserted that Ms. Richardson continues to be unable to sit for long periods of time; continues to have pain as a result of her psoriatic arthritis and other arthritic pain.

On appeal we completed independent medical and vocational reviews to determine if the medical evidence supported Ms. Richardson's inability to perform other gainful occupations on a part time or full time basis after 24 months of payments in accordance with the policy provisions. You provided additional medical records from Dr. Thomas Barnett, urologist and Dr. Harold Docherty, internist/rheumatologist for consideration. Please note these records did not include any specific restrictions and limitations from any provider beyond July 20, 2008. We also reviewed records from the following:

• Dr. Kim Jackson, PCP
• Dr. Kenneth Kammer, neurosurgeon
• Dr. Louis Palles. OB/GYN
• Julie Smith, FNP
• Dr. Daisy Antique, PCP
• Dr. Docherty
• Dr. Santiago
• FCE completed by Mary Margaret Heinford, PT on April 20, 2008

By way of history, Ms. Richardson stopped working as a registered nurse on August 23, 2004 due to being rear ended in a motor vehicle accident. Subsequently she experienced an onset of neck, shoulder and low back pain. Although the initial studies of her cervical and lumbar spine were unremarkable and neurosurgical consult revealed no need for surgical intervention, the insured reportedly failed to respond to conservative treatment, which included medications (anti inflammatory agents, muscle relaxants, pain medications, physical therapy and a single cervical epidural steroid injection). She continued to report progressive symptoms of paresthesia and weakness of her left upper extremity, consistent with cervical spondylosis and stenosis.

On January 12, 2007 the records document that Ms. Richardson underwent an anterior microsurgical disc excision at C5-6 and C6-7 with bilateral foraminotomies at C5-6 and a left-sided foraminotomy at C6-7 with decompression of the spinal canal and spinal cord at C5-6 with iliac crest interbody fusion grafts at both C5-6 and C6-7 and plate and screw stabilization at C56-7 by Dr. Kenneth Kammer for cervical spondylosis and stenosis at C5-6 and C6-7 with compressive cervical myelopathy at C5-6, and left C6-7 radiculopathy plus degenerative kyphosis at C5-6. As of September 5, 2007 Dr. Kammer indicated that Ms. Richardson's spinal cord decompression was successful, the paresthesia in her upper extremities had resolved, and her CT scan showed a solid arthrodesis at C5-6 and C6-7 respectively. He stated that he had instructed her to discuss Botox injections with her rheumatologist as treatment for her cervical muscle spasms but noted that she had reached MMI (medical maximum improvement) and would see her in the future as needed.

The claim file notes that neither Dr. Docherty nor Dr. Kammer were providing ongoing restrictions and limitations so it was determined an FCE would be necessary to assess Ms. Richardson's level of functioning. An FCE was completed on April 29, 2008 at Heartland Therapy Provider Network. The examiner noted the following based on Ms Richardson's demonstrated performance of function:

- Her physical demand level was determined to be light (exerting upto 20 lbs, occasional or 10 lbs, frequent, sit most of the time, walk or stand a significant degree, involves push/pull).
- She might benefit from a part time return to work (up to 4 hours/day at light); then increasing her hours as tolerated to full-time
- The examiner in an addendum commented that she currently did not have full-time capacity for a sedentary level exertion demand occupation.
- It was indicated that she would benefit from a work hardening program progressing slowly due to de-conditioning with poor endurance.
- It was further suggested that she would benefit from a strict home exercise program including range of motion, strengthening of core and upper/lower extremities, pool access opined to assist with water aerobics, swimming, walking etc.-conditioning program starting daily for one hour/day increasing as tolerated up to 3-4 hours per day. Other identified home exercises included recumbent bike, upper extremity bike and theraband.
- She was reported to have performed with full effort during all of the testing.
- Her left hand grip was significantly decreased secondary to right hand grip. It was recommended that she would need a headset secondary to Cspine surgery, limited constant computer use and time for stretching. She would need a keyboard and mouse support.
- Ms. Richardson reported the following which may have impacted her performance: she did not sleep well the night before the examination, she complained of C-spine pain during most of the test, had difficulty descending stairs with right lower extremity, she often shook her left hand and she moved very slowly during the entire test
- She reportedly drove herself to the examination with no rest breaks (driving duration was 35 mins).
- She was observed to be consistent with bending knees for lifting and held the railing for steps moving very slowly and guarded during the entire test.
- She was observed to have difficulty lifting at knee level with less pain at waist level.
- Work station accommodations recommended included an adjustable chair, possible key and mouse support (keyboard at waist level with monitor raised directly in front of her).
- She should get out of the carat the 45 minute mark of constant drive or travel
- Cited medical considerations included: taking medication that will affect working (Zanaflex, Percocet, Neurontin, Ultram, Daypro, Lexapro, cane for ambulation in yard; motor coordination problems, and avoidance of heights or moving machinery.

One of our medical consultants, a physician board certified in Occupational Medicine and Forensic Medicine reviewed Ms Richardson's file and concluded that the restrictions and limitations noted in the FCE dated April 29, 2008 are valid and supported. Therefore, a graduated return to work, even in a sedentary physical demand work capacity, would be prudent. Such a program may include the following: 4 hours/day x 2 weeks, then 6 hours/day x 2 weeks, and then 8 hours/day thereafter.

Additionally, the appeal medical review noted the following other conditions/restrictions and limitations:

- **Cervical spine conditions/complaints:** In addition to the restrictions and limitations noted within the FCE, an individual who is status post ACDF at multiple cervical levels, would like (sic) accrue restrictions and limitations of: avoid prolonged static postures of the neck, particularly in extension, avoid overhead work, avoid repetitive bending/twisting of the neck; and avoid rifting/carrying and push-pull activities, which exceed a sedentary or light physical demand level. An individual with myofascial findings should have the ability to intermittently change positions and stretch during the work day.

- **Lumbar spine conditions/complaints (including SI joint dysfunction)**: The file documentation indicates that Ms. Richardson has a history of multiple motor vehicle accidents (MVAs) and chronic lumbar region pain. A neurosurgical evaluation of low back complaints, dating back to September of 2004 and in proximity to the reported MVA in August of 2004, revealed an impression of chronic lumbalgia due to degenerative spine disease and SI joint dysfunction with recommendation for specialized physical therapy for SI joint dysfunction. Dr. Santiago found no evidence for a neurosurgical lesion contributing to Ms. Richardson's chronic pain complaints. She was prescribed skeletal muscle relaxants, Ultram and Percocet medications for breakthrough pain at night Plain radiography and a lumbar MRI dated September 2004 failed to reveal any acute findings, HNP (herniated nucleus pulposis), or neurocompressive lumbar spinal pathology, though decreased signal in the lumbar disc, which was consistent with DDD (degenerative disc disease), was described. By January 2005 Dr. Santiago suggested a rheumatology evaluation might be helpful. Dr. Docherty ordered an L-spine MRI on August 11, 2006 which reportedly revealed: mild degenerative changes at L3-4 with small left paracentral disk protrusion encroaching on the descending left L4 nerve root; and mild degenerative changes at L4-5 with minimum left paracentral disk protrusion. There currently are no recorded examinational findings (e.g. physical orelectro- diagnostic) in the claim file to support a persistent neuro-muscular deficit related to the L-S spinal region. With the imaging findings described above, Ms. Richardson's low back complaints would be consistent with that data, though there is currently no evidence of a radiculopathy. Additional restrictions and limitations based on the above described examinational finding would include: avoid repetitive bending, twisting, and stooping; avoid prolonged sitting, standing, walking (should have the opportunity to intermittently change positions for comfort); limit lift-carry and push-pull activities to a sedentary or light physical demand level.

- **Bilateral Carpal Tunnel Syndrome (CTS)**: This condition is supported by the electrodiagnostic studies completed on September 9, 2004 and is referenced throughout multiple healthcare provider records without evidence that this condition would have precluded work capacity from July 20, 2008 forward. A recommendation

was made for Ms. Richardson to use a splint, though it is unclear if this was uniformly performed. There are no recent documented referrals for orthopedic or hand surgery evaluation, and it does not appear that surgical decompression (i.e. CTR) is deemed necessary at this time. The following restrictions and limitations would be supported in an individual with CTS: excessive vibratory forces (e.g. hand-operated equipment/machinery with heavy vibration); and forceful or highly repetitive hand/wrist activities. An ergonomically correct work station should be employed so as to prevent progression of CTS/CTS symptoms.

- **Shoulder condition/complaints:** The records reflect that Ms. Richardson reported shoulder pain subsequent to her MVA in August of 2004. There is no imaging abnormalities reported in association with this complaint. A rheumatology office visit note from April 2007indicated a diagnosis of shoulder pain and rotator cuff tear (without examinational data). In May of 2008 a rheumatology office visit note indicated there was still no difference in the shoulder (this was not further specified or delineated). Therefore, the current records do not provide clear medical evidence of the level, if any, of residual impairment of Ms. Richardson's shoulder(s), and it does not appear that any healthcare provider has proffered restrictions and limitations specifically for any shoulder condition(s). Therefore, there appears to be no indication for restrictions and limitations beyond those determined by the FCE.

- **Rheumatological conditions/complaints:** A number of conditions have been referenced in the rheumatology records including, but not necessarily limited to: psoriatic arthritis, spondyloarthropathy, fibromyalgia (FM) myalgias and arthralgias, polyarthritis, trochanteric bursitis, and generalized osteoarthritis/0A knees. Although diffuse myalgias and arthralgias have been reported, the current file records do not contain medical documentation consistent with the American College of Rheumatology's 1990 Criteria for the Classification of Fibromyalgia. In February of 2008 the rheumatologist noted the presence of tenderness of the small joints in the hands and right knee; however, there was neither physical examinational data (redness, swelling, loss of function) nor imaging data to suggest the presence of acute synovitis or an inflammatory arthropathy or inflammatory myopathy. It does not appear that reported acute phase reactants have reflected an acute inflammatory rheumatological condition. A psoriaform rash has been described, and the diagnosis of probable spondyloarthropathy (i.e. psoriatic arthritis) ensued with initiation of a DMARD and methotrexate medication in July of 2008 with apparent consideration for TNF therapy as well. Additional medications noted recently included corticosteroid therapy, neuromodulator therapy, NSAID therapy, narcotic analgesic therapy, and skeletal muscle relaxant therapy, as well as SSRI therapy. No imaging reports, aside from spinal imaging reports, appear to have been provided whereby to assess the severity and extent of the referenced osteo-arthritic involvement. It appears Ms. Richardson was treated for trochanteric bursitis in 2005 without evidence of current physical impairment. The rheumatologist noted in January of 2008 that Ms. Richardson possibly had full-time sedentary capacity but recommended a functional capacity assessment. Based on the medical evidence submitted there are no additional

restrictions and limitations supported beyond those noted within the FCE in relation to these conditions. Again it is noted that the FCE examiner did not opine that Ms. Richardson had the capacity to perform full-time sedentary work as of April 29, 2008, but indicated that she would benefit from a work hardening program progressing slowly due to deconditioning with poor endurance.

- **Obesity/expected de-conditioning:** The most recently recorded weight in the current medical records appears to be 301 pounds in July of 2008 (Height 5'7") which yields a calculated BMI (body mass index) of 47.1 which is indicative of severe obesity. This level of obesity, in conjunction with expected generalized de-conditioning, could be expected to adversely impact sustainable functions. These issues have been addressed in the FCE; therefore, no further restrictions and limitations related to these two issues would be necessary.

- **Urolithiasis:** The current medical records reflect an evaluation with Ms. Richardson's primary care physician in September of 2007 for complaints of blood clots in her urine with clear urine at that time. She was treated for presumptive impression of kidney stone(s) with Cipro medication (fluoroquinolone antibiotic). A KUB (kidneys, ureters, bladder) study was ordered and reportedly was positive for a small stone on the right. Urological evaluation and management ensued with Dr. Barnett. Reportedly, abdominal-pelvic CT (computerized tomography) on October 1, 2007 revealed multiple small bilateral renal stones and an 8mm stone in the left ureter at the pelvic inlet obstructing the left kidney. Ms. Richardson was provided with Flomax medication (alpha-adrenergic blocker) and a urine strainer but she failed to pass the stone. ESWL (lithotripsy) reportedly ensued on December 5, 2007; however on December 18, 2007, Dr. Barnett felt the KUB still showed some stone fragments in the distal left ureter. He recommended the continuation of Flormax and repeat KUB after the holidays. The report of the KUB completed on January 9, 2008 revealed a small calcification of inferior to the L SI joint with bilateral phleboliths- may represent a ureteral stone. A report of an abdominal-pelvic CT dated January 9, 2008 revealed a distal left ureteral stone measuring 6.6 mm in the left distal ureter with mild dilatation of the distal ureter. It is unclear what, if any, further urological procedures ensued (stone basket retrieval, urinary stenting, etc.) There is currently no documentation that urgent or emergent evaluation/management occurred for her urolithiasis. The rheumatologist did provide a prescription for HCTZ on July 2008 to decrease calcium excretion (elevated urinary calcium reported in July of 2008 at 378 mg/24 hrs [reference value: <260 mg/24 hrs]). Although Ms. Richardson has persistent urolithiasis findings, it does not appear that any healthcare provider has proffered any restrictions and limitations relative to a urological complaint/condition. Her renal colic episode may be contributory to some of her low back pain. There would be no additional restrictions and limitations expected for this condition beyond what has been identified within the FCE.

- **Depression:** This condition was referenced in the primary care records with Lexapro medication (SSRI agent) and a counseling referral offered on December 19, 2007;

however, it appears Ms. Richardson deferred formal behavioral health evaluation and or management to date. There have been no actual behavioral health records provided for review and there has been no healthcare provider who has proffered any restrictions and limitations related to any behavioral health condition.

- **Medication issues (i.e. adverse effects):** The medical records document Ms. Richardson's complaints related to the following medication: Motrin was suspected to cause gastritis symptoms and were addressed with proton pump inhibitor therapy (Nexium samples from Dr. Santiago in September 2004); Flexeril and Skelaxin was suspected to cause sleepiness and hangover sensation (Robaxin was substituted by Dr. Santiago in November 2004 for these agents which apparently were being used concurrently); Robaxin was suspected to cause loose stools (this apparently resolved and she used this medication after that report of adverse effect without problems). The recent medical records do not consistently support any adverse medication effects, which would have precluded a sedentary work capacity from July 20, 2008 forward. It is noted that Ms. Richardson home schools her child, which would appear to reflect adequate cognition and sedentary physical capacity.

- **Other previous surgical and gynecological procedures:** Cholecystectomy, T&A (tonsillectomy & adenoidectomy), C-Section, wisdom teeth extraction and conization of the cervix were referenced within the medical records. There is no current file medical evidence that adverse sequela related to any of these procedures would have precluded work capacity from July 20, 2008 forward.

An appeal, independent vocational review was completed to determine if the previously identified gainful occupations were consistent and suitable based on the functional capacity noted within the FCE and Ms Richardson's training, education and experience. A gainful occupation for Ms, Richardson would provide her with an hourly wage of $9.60. The review concluded that the previously identified occupation of Hospital Admitting Clerk with a median hourly wage of $10.09 which is performed primarily seated with occasional periods of standing and walking; occasional exertion not greater than 10 pounds; frequent reaching and handling which can be managed to dominant upper extremity; and occasional fingering, would exist on a full-time or a part-time basis. However, the Utilization Review Coordinator occupation is not typically available on a part-time schedule.

In addition, Ms. Richardson would also be considered a viable candidate for an entry level sedentary position as a Telephonic Nurse Case Manager($20.43/hr) and Telephonic Triage ] Nurse ($18.80/hr) occupations. These occupations would typically be available on both a full-time and part-time basis. These occupations would also typically be considered compatible with the use of a fixed, raised workstation and an accompanying fixed raised work stool. Such workstation arrangements are commonplace in today's office environments and would allow for full flexibility with respect to position changes (sit/stand/stretch) throughout the work day.

In conclusion, the medical evidence documented in our file supports that Ms. Richardson had the capacity as of April 29, 2008 to perform sustained part time sedentary work activity. In addition, it was further concluded that with a work hardening program due to her de-conditioning she would have been capable of performing full-time sedentary work activity within 30 days. In accordance with the above noted provision, since Ms. Richardson has the capacity to perform part-time work in gainful occupations identified and no further benefits would be payable. As you may know, Ms. Richardson was provided an additional 30 days of benefits to allow for a transition from part- time to full- time employment.

At this time, we will provide Ms. Richardson an additional 30 days (by November 14, 2008) to provide any additional information for our review on appeal. If we do not receive any additional information by November 14, 2008 our decision will be to uphold the prior determination. Please note, the FCE was provided to Dr. Docherty and to date we have had no response from him in regard to the findings and or recommendations.

(Exhibit 1, UACL01731-1738).

On October 28, 2008, Plaintiff attorney submitted an affidavit from Plaintiff to Unum for it to consider. (Exhibit 1, UACL01743-1745). On November 12, 2008, Unum wrote Plaintiff's attorney informing him that the information contained in Plaintiff's affidavit was not new, and that this same information was previously considered during the appellate evaluation. (Exhibit 1, UACL01749-1750).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . .[the moving party] is entitled to a judgment as a matter of law." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-52.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255. Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (internal quotations omitted).

## STANDARD OF REVIEW

The Court must first determine the applicable standard of review in relation to the claim for long term disability benefits. It appears to be undisputed that the Plan at issue contains language conferring on Unum the "discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the Policy." (Exhibit 1, UACL00063). This language, therefore, qualifies under Firestone Tire and Rubber Co. v. Bunch, 489 U.S. 101 (1989), as conferring to Unum the discretionary authority to determine eligibility for benefits or to construe the terms of the plan. That being the case, the appropriate standard of review for interpretations of the plan is the abuse of discretion standard. Firestone, 489 U.S. at 111.

When a fiduciary has been granted discretion by an ERISA Plan, the Courts will review the fiduciary's decision-making for abuse of discretion and will not disturb its decisions if they are reasonable. Booth v. Wal-Mart Stores, Inc., 201 F.3d 335 at 340, 342. (4th Cir. 2000) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989)). "[A] decision is reasonable if it is the

result of a deliberate, principled reasoning process and if it is supported by substantial evidence"
Ellis v. Metro. Life Ins. Co., 126 F. 3d 228, 232 (4th Cir. 1997). Substantial evidence is the quantum
and quality of relevant evidence that is more than a scintilla but less than a preponderance and that
'a reasoning mind would accept as sufficient to support a particular conclusion.' Donnell v.
Metropolitan Life Ins. Co., 165 Fed.Appx. 288, 295 (4th Cir. 2006) (quoting LeFebre v.
Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984)(overruled by implication on other
grounds)).

> The Fourth Circuit has reiterated the law concerning the standard of review:

> In cases in which a court reviews an ERISA Plan Administrator's decision to deny benefits,
> a reviewing court must initially decide *de novo* whether the plan's language grants the
> administrator discretion to determine the claimant's eligibility for benefits, and if so, whether
> the administrator acted within the scope of that discretion. If the reviewing court determines
> that the language of the plan confers discretion on the administrator to determine eligibility
> or to construe terms of the plan, then a court reviews the decision to deny benefits for abuse
> of discretion.

Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir.2000) ( citing Firestone ).

> Further, "[t]his deferential standard of review requires that a reviewing court not disturb an
administrator's decision if it is reasonable, even if this Court would have reached a different
conclusion." Id.

> The Fourth Circuit further enunciated the standards applicable to the scope of review of

courts in ERISA cases in Colucci v. AGFA Corp. Severance Pay Plan, 431 F.3d 170 (4th Cir.2005).

In Colucci, the Court explained:

> When a plan by its terms confers discretion on the Plan's Administrator to interpret its
> provisions and the administrator acts reasonably within the scope of that discretion, courts
> defer to the administrator's interpretation. In those circumstances, a court will not disturb an
> administrator's decision as long as it is reasonable. This is because the plan, in conferring

discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable. The plan thus recognizes that on such a matter, various reasonable decisions and interpretations could be made, and it accepts, as a contractual term of the plan, the range of decisions that a trustee could reasonably make . . . Yet when the plan's terms are ambiguous in the sense that its language gives rise to at least two different but reasonable interpretations and when the plan confers discretion on the administrator to interpret the plan and resolve ambiguities, a court defers to the administrator's interpretation by reviewing it only for abuse of discretion.

Id. at 176. (Citations omitted).

The Fourth Circuit has described how a "conflict of interest" impacts the court's review of a benefit claim denial. In Bedrick v. Travelers Insurance Company, 93 F.3d 149, 152 (4th Cir.1995), the court held as follows:

Travelers concedes that it has a conflict of interest, but the parties debate what the conflict means. Travelers says its conflict is merely a 'factor,' citing the passage from Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), while Plaintiffs say that it changes the standard of review, citing this court's cases . . . Our cases are interpretations of Firestone, and we apply Firestone's 'factor' in this manner: 'when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interest of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.'

Under this standard, "the court modifies [the] abuse of discretion standard according to a sliding scale." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir.1997). "The more incentive for the administrator ... to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] ... decision must be and the more substantial the evidence must be to support it." Id. The Court, therefore, is to apply a "sliding scale" and reduce the amount of deference given to the fiduciary's decision and determine, based on review of the record before the fiduciary at the time of decision-making, whether the fiduciary's decision

is consistent with a decision that might have been made by a fiduciary acting free of the interests that conflict with those of the beneficiaries. See Ellis, 126 F.3d at 233.

Plaintiff initially contended (in her brief) that the Court should reduce the deference given the Defendant's decision to a de novo or, at a minimum, a modified abuse of discretion standard, in order to neutralize the untoward influence resulting from that direct conflict of interest. Defendant recognizes the inherent conflict of interest and indicates that where the administrator both evaluates and pays benefits claims, the Court must weigh such conflict of interest as a factors in determining whether there is an abuse of discretion. See Metropolitan Life Insurance v. Glenn, 128 S. Ct. 2343 (U.S. 2008); Firestone, 489 U.S. at 115; Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 634, 639 (4th Cir. 2007); Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000); Ellis, 126 F.3d at 233. At the hearing on this matter, Plaintiff's counsel conceded that a modified abuse of discretion standard is appropriate in this case, and that a de novo standard is not applicable. After careful review, this Court concludes that a modified abuse of discretion standard would be appropriate in this case given that Unum insured the claim that it was administering. Accordingly, in light of the conflict of interest, Unum's decision is entitled to reduced deference and the decision to deny Plaintiff's benefits must be examined closely to determine whether Unum's decision was objectively reasonable, and supported by substantial evidence.

**DISCUSSION**

In determining whether Defendant Unum's decision was reasonable under a modified abuse of discretion standard of review, the Court may consider the following factors: "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make

the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir.2000). The Booth factors are best viewed "as more particularized statements of the elements that constitute a deliberate, principled reasoning process and substantial evidence and of the reasons for applying a modified abuse of discretion standard of review." Donnell v. Metro. Life Ins. Co., 165 Fed. Appx. 288, 294 n.6 (4th Cir. 2006) (unpublished) (quotations omitted). The "conflict of interest" factor "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision…" Glenn, 128 S. Ct. at 2351. The factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Id. Thus, "[t]he more incentive for the administrator . . . to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it." Ellis, 126 F.3d at 233.

In reviewing the decision in this case, it is necessary to first and examine the plan language that is relevant in this case.

The policy states in relevant part as follows:

### *HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury, and

- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

. . .

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not in itself, constitute disability.

We may require you to be examined by a physician, other medical practitioner or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

(Exhibit 1, UACL00067).

**Material and Substantial Duties** means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified.

(Exhibit 1, UACL00088).

### WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following:

25

**All full-time and part time employees, excluding union employees except those who have negotiated an LTD benefit, and Corporate paid Employee physicians**

- during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;

- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you chose not to;

  . . .

- the date you are no longer disabled under the terms of the plan…

(Exhibit 1, UACL00074-75).

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 month of your return to work.

(Exhibit 1, UACL00087).

Defendant Unum asserts that its claim determination was the result of a deliberate principled reasoning process and was supported by substantive evidence. In its memorandum in support of judgment, Unum has analyzed each of the factors set forth in <u>Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000), and contends that based on these its claims determination was reasonable, and was not an abuse of discretion. The Plaintiff disagrees.

Plaintiff challenges Unum's decision and specifically asserts that the determination that Plaintiff would be able to perform sedentary work within 4 weeks is unsupported by the functional capacity evaluation and therefore unreasonable. Plaintiff indicates that after reviewing the results of a Functional Capacity Evaluation (FCE), Unum determined that Plaintiff could perform sedentary work and perform the duties of any gainful occupation. (Exhibit 1, UACL01484-1485). Plaintiff asserts that because Unum made this decision in direct contradiction to the FCE evaluator's determination that Plaintiff was not ready at the time of the FCE to return to either sedentary work

or light work, a question exists as to whether or not Unum abused its discretion in arbitrarily determining that Plaintiff would be able to perform sedentary work within 4 weeks and would no longer meet the "Any Occupation" definition of disability. Plaintiff asserts that the FCE evaluator specifically noted that the "patient would possibly benefit from part time status increasing hours as tolerated to full time in that she has been out of work for several years." (Exhibit 1, UACL01430). Plaintiff indicates that as Unum was dissatisfied with this response, it obtained an addendum to the FCE report to specify some timeline as to whether or when Plaintiff would be ready to return to work. However, Plaintiff indicates that the evaluator still would not state that Plaintiff had the ability to perform full time sedentary work and did not provided a specific timeframe for Plaintiff's return to work; but that instead, the evaluator reiterated that Plaintiff "would benefit from a work conditioning program *progressing slowly* in that this person is deconditioned with poor endurance."(*emphasis added*). (Exhibit 1, UACL01457). The Plaintiff takes issue that although the evaluator, who actually performed the FCE, did not provide any timeline in neither her first report nor her addendum, Unum's hired independent medical reviewer, Dr. Leverett determined that Plaintiff would be able to return to work in a sedentary level within 4 weeks. The Plaintiff argues that this decision was not based on any medical testing or any direct evaluation of Plaintiff; and that furthermore, the reviewer never gave any other basis for his decision except that he completed a review of the record and the findings of the FCE. Plaintiff also asserts that Unum fails to provide any medical documentation to support its decision that Plaintiff no longer met the definition of disability under the terms of the plan. Plaintiff suggests that as the evaluator who performed the FCE offered no timeline for Plaintiff's return to work, that therefore even after the FCE, Plaintiff continued to be disabled according to the plan. Plaintiff also asserts that a factor that should be

considered by this Court in determining whether Unum's decision was a reasonable one is Unum's past history of unreasonable decisions.

## ANALYSIS

This Court will review the decision using the modified abuse of discretion standard of review, as discussed, <u>supra</u>.

"[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." <u>Ellis v. Metropolitan Life Ins.</u>, 126 F.3d 228, 232 (4th Cir.1997) (internal quotation marks omitted); <u>see also Evans v. Metropolitan Life Ins. Co.</u>, 358 F.3d 307, 311 (4th Cir.2004). This Court has carefully reviewed the entire final administrative record in this case, including all of the submitted medical records. Additionally, the Court has carefully considered the arguments of the parties and all of the factors outlined in <u>Booth</u> in assessing the reasonableness of the administrator's decision. After deliberation, the Court finds the Defendant's arguments sufficiently persuasive, and finds that the decision in this case was both the result of a deliberate and principled reasoning process and supported by substantial evidence.

The Defendant Unum performed a deliberate and principled review in concluding that the Plaintiff no longer met the contractual definition of disability. It appears that Defendant Unum reviewed and considered all of the Plaintiff's medical records which were submitted prior to a final decision being reached. Defendant Unum provided Plaintiff with a full and fair review of her claim. The Administrative Record reflects that Plaintiff's claim and medical records were reviewed, her appeal addressed, and reasons were issued for denial decisions. This Court finds no evidence in the record to suggest that the process was arbitrary and capricious, but instead concludes that the record establishes that Plaintiff was provided a full opportunity to, and did in fact, file her claim, make

supporting argument, submit medical records and appeal the denial decision. Additionally, the Court notes that during the appeal, the claim was reviewed by a different medical reviewer than the one who reviewed the claim during the initial claim.

In addition to performing a deliberate and principled review, the Defendant Unum's conclusion was supported by substantial evidence, much of which has already been recited above. After careful consideration, the Court concludes that the Record does not establish that Plaintiff continued to meet the plan's contractual definition of disability. In the present case, Plaintiff was paid benefits for the period February 2, 2005 until July 20, 2008. These payments fully covered benefit payments for the 24 month "regular occupation" definition of disability. The purpose of the plan was to offer graduated, limited coverage and not guaranteed lifetime benefits. Participants had to prove their entitlement to benefits on an ongoing basis based on the applicable definitions of disability. This Court finds that Defendant Unum's decision to deny Plaintiff's claim under the "any gainful occupation" definition of disability was supported by substantial medical and vocational evidence, This evidence included an independent functional capacity evaluation, multiple medical reviews by board certified medical specialists, multiple vocational assessments performed by appropriately credentialed experts, and the medical records of Plaintiff's own treating physicians. The independent functional capacity evaluation performed by Mary Heniford, PT found that Plaintiff had part time light work capacity (exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently. (Exhibit 1, UACL01424-1432). An addendum to the FCE indicated that a work conditioning program starting slowly and gradually working into strengthening exercises for core and upper and lower extremities would be beneficial. (Exhibit 1, UACL01457). It should be

noted that the use of an FCE to determine Plaintiff's work capacity was supported by Plaintiff's treating rheumatologist, Dr. Doherty. (Exhibit 1, UACL01051-1052). Based on the FCE findings, Defendant Unum's medical reviewer, Dr. Leverett, found, "Insured would be able to return to work in a sedentary level for 4 hours per day for 2 weeks; then 6 hours per day for 2 weeks; then 8 hours per day from then on." (Exhibit 1, UACL01464). These findings were corroborated by Jacob Martin, M.D., a board certified occupational medicine and forensic specialist. Dr. Martin found that there was no medical evidence that precluded Plaintiff from having full time sedentary work capacity from July 20, 2008 forward. (Exhibit 1, UACL01712-1722). Even assuming that Plaintiff only had part-time work capacity to perform sedentary work, the fact that Plaintiff chose not to work in any gainful occupation on a part-time basis precluded an award of benefits. As the plan states, benefits will end "after 24 months of payments, when you are able to work in any gainful occupation on a parttime basis but you chose not to." (Exhibit 1, UACL00074-75). The Court finds it noteworthy that none of Plaintiff's treating physicians, despite multiple attempted contacts by Defendant Unum to obtain Plaintiff's restrictions and limitations, opined as to Plaintiff's work capacity during the relevant period. In fact, Dr. Kammer, Plaintiff's neurosurgeon, refused to render any opinion as to Plaintiff's work capacity. (Exhibit 1, UACL00678, 00795, 01041). Dr. Doherty, Plaintiff's treating Rheumatologist, "acknowledged that she possibly had full time sedentary level work capacity, and that may be worth a trial, but that you recommend an FCE to best determine her current work capacity." (Exhibit 1, UACL01052). Accordingly, as asserted by Defendant, Plaintiff's physicians' opinions fail to support disability. In addition to the medical evidence, Defendant Unum's decision was supported by the vocational evidence. Robin Giese, CRC, CDMS, CDMS, found that taking into account Plaintiff's restrictions and limitations, based on Plaintiff's education, training and experience, she could perform multiple sedentary occupations, including, receptionist (outpatient),

hospital admitting clerk, and utilization review coordinator. (Exhibit 1, UACL01468-1472). These findings were substantiated by Richard Byard, JD, MS, CRC, a Senior Vocational Rehabilitation Consultant, who agreed with the previous vocational review, and additionally indicated that Plaintiff could perform additional occupations not listed in the previous reports such as telephone nurse case manager, and telephonic triage nurse. (Exhibit 1, UACL01723-1725). Therefore, Defendant Unum's claim determination was supported by (and uncontradicted by) the vocational evidence contained in the administrative record. Defendant asserts that the materials used by Unum to deny Plaintiff's claim were adequate and supplied Unum with substantial evidence to support the denial of Plaintiff's continuing claim. This Court agrees. After a thorough review of the evidence presented in the record of this case, and for the reasons cited above, this Court cannot conclude that Defendant Unum abused its discretion in concluding that Plaintiff no longer met the contractual definition for disability.

## CONCLUSION

In summary, after careful consideration of the relevant case law and evidence of record, this Court determines that Defendant Unum engaged in a deliberate, principled reasoning process and that its decision is supported by substantial evidence. The Court concludes that there is substantial evidence in the administrative record to support Unum's decision that the Plaintiff is not entitled to continued disability benefits under the plan as she no longer meets the contractual definition for disability. Accordingly, for the reasons outlined herein, it is hereby **ORDERED** that the Defendant Unum's motion for judgment based on the administrative record is **GRANTED** (Doc. # 27).

**IT IS SO ORDERED.**

s/ Terry L. Wooten
February 8, 2010                      TERRY L. WOOTEN
Florence, SC                           UNITED STATES DISTRICT JUDGE